**Case No. 25-40624**

---

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Association of American Physicians and Surgeons Educational Foundation, AAPS;
Pierre Kory, M.D., M.P.A.; Paul E. Marik, M.D., FCCM, FCCP,

Plaintiffs - Appellants

V.

American Board of Internal Medicine, ABIM; American Board of Obstetrics &
Gynecology, ABOG; American Board of Family Medicine, ABFM; Kristi Noem,
Secretary, U.S. Department of Homeland Security,

Defendants - Appellees

---

Appeal from the U.S. District Court for the
Southern District of Texas, Galveston Division (No. 3:22-CV-240)

---

**BRIEF OF APPELLANTS**

---

Andrew L. Schlafly
939 Old Chester Rd.
Far Hills, New Jersey 07931
908-719-8608
908-934-9207 (fax)

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PARTIES

The case number here is No. 25-40624, *Association of American Physicians and Surgeons Educational Foundation, et al. v. American Board of Internal Medicine, et al.*

Appellant Association of American Physicians and Surgeons Educational Foundation is a non-profit corporation that has no parent corporation, and no publicly held corporation owns 10% or more of its stock. The additional Appellants are individuals.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Appellants**: Association of American Physicians and Surgeons Educational Foundation, Pierre Kory, and Paul E. Marik, using undersigned counsel Andrew L. Schlafly, 939 Old Chester Rd., Far Hills, NJ.

**Appellees:** American Board of Internal Medicine, represented by Paul Lantieri, III, Elizabeth Weissert, and Jason Allen Leckerman, Ballard Spahr, L.L.P., 51st Floor, 1735 Market Street, Philadelphia, PA, Eric K. Gerard, Hogan Lovells US, L.L.P., Suite 4300, 609 Main Street, Houston, TX, David Benjamin Gerger, Gerger Hennessy Martin & Peterson, Suite 2300, 700 Louisiana Street, Houston, TX, and Andrew Philip Valencia, Ballard Spahr, L.L.P., Suite 2300, 1800 Larimer Street, Denver, CO. In addition, in the district court below there was an appearance by Leslie E. John, Ballard Spahr LLP, 1735 Market Street, Philadelphia, PA.

American Board of Obstetrics & Gynecology, represented by Ashley T. Parrish, McGinnis Lochridge, L.L.P., Suite 3000, 500 N. Akard Street, Dallas, TX, and April Elizabeth Lucas, McGinnis Lochridge, L.L.P., Suite 400, 1111 W. 6th

Street, Building B, Austin, TX. In addition, in the district court below there was an appearance by Marcus V. Eason, McGinnis Lochridge, Suite 2800, Houston, TX.

American Board of Family Medicine (as represented in district court below, as this entity is not a party on appeal here), represented by Cassie J. Dallas and Barry Andrew Moscowitz, Thompson, Coe, Cousins & Irons, L.L.P., 25th Floor, 700 N. Pearl Street, Plaza of the Americas, Dallas, TX.

Alejandro Mayorkas and then Kristi Noem, Secretary, U.S. Department of Homeland Security, represented by Daniel Bentele Hahs Tenny and Michael P. Clendenen, U.S. Department of Justice, Civil Division, 1100 L Street, N.W. Washington, DC, and Simon Christopher Brewer and Samuel B. Goldstein, U.S. Department of Justice, Civil Division, 950 Pennsylvania Avenue, N.W., Washington, DC., and Indraneel Sur, U.S. Department of Justice, Civil Division, Suite 12306, P.O. Box 883, Washington, DC. In addition, then-Defendant Mayorkas was represented in district court below by Laurel H. Lum, U.S. Department of Justice, Civil Division, Federal Programs, 1100 L Street NW, Ste 11008, Washington, DC.

Dated: December 2, 2025

s/ Andrew L. Schlafly
Attorney for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

As in the prior appeal of this matter – for which oral argument was held – Appellants respectfully request oral argument due to the immense significance of the First Amendment, censorship, and antitrust issues presented here, including important legal issues of first impression.

# TABLE OF CONTENTS

Page(s)

Certificate of Interested Parties ............................................................... ii

Statement Regarding Oral Argument ....................................................iv

Table of Contents ...................................................................................v

Table of Authorities ............................................................................ vii

Jurisdictional Statement .......................................................................1

Statement of Issues..............................................................................1

Statement of the Case.........................................................................2

     A. Factual Background ....................................................5

     B. Relevant Procedural History ....................................26

     C. Rulings Presented for Review.................................27

Summary of Argument .......................................................30

Argument............................................................................31

I. Standard of Review..........................................................31

II. Publicly Restricting Physicians' Ability to Practice Medicine is a Public Function, and Defendants ABIM and ABOG Engage in State Action When They Decertify Physicians Based on Ideology .......................................32

     A. A Defendant May Be a State Actor for Some Purposes, But Not Others, as Defendants ABIM and ABOG Are ...............................33

     B. The Incorporation of Board Certification into Licensure by the Interstate Medical Licensure Compact Shows It Is a Public Function When Defendants ABIM and ABOG Decertify ...........................................40

III. Antitrust Injury Exists Because Physicians Are Being Excluded from the Market by Defendants ABIM and ABOG ...............................................................42

    A. The District Court Misapplied Inapplicable Precedents ..........................44

    B. The Board Defendants' Misuse of Monopoly Power to Censor Speech Reinforces the Existence of Antitrust Injury ...................................48

    C. Antitrust Injury Was an Inappropriate Basis for Dismissal at the Pleading Stage Below .....................................................................................50

IV. Plaintiffs Adequately Pled Tortious Interference ...............................................51

V. Plaintiffs Kory and Marik Adequately Pled Defamation ...................................52

VI. Plaintiffs' FACA Claim Against the Government Is Not Moot, and Was Improperly Dismissed Below .................................................................................53

VII. The District Court Improperly Denied Reasonable Discovery ........................56

Conclusion .................................................................................................................58

Certificate of Compliance .........................................................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                      Page(s)

*Am. Bd. of Internal Med. v. Muller*, No. 10-CV-2680,
   2011 U.S. Dist. LEXIS 25169 (E.D. Pa. Mar. 10, 2011) ...................... 35, 39

*American Society of Mechanical Eng'rs v. Hydrolevel Corp.*,
   456 U.S. 556 (1982).................................................................45-46

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946) .............................. 49

*Arnold v. Williams*, 979 F.3d 262 (5th Cir. 2020) ...................................................31

*Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal
   Med.*, 103 F.4th 383 (5th Cir. 2024)............................................................. 26

*Bailey v. McCann*, 550 F.2d 1016 (5th Cir. 1977)................................ 28, 34, 35, 36

*Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012) .................................32

*Belk v. Chancellor of Wash. Univ.*, 336 F. Supp. 45 (E.D. Mo. 1970).................. 38

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)...........................................49

*Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869 (3d Cir. 1995) ............................... 50

*Bridges v. Methodist Hosp.*, No. 24-20483,
   2025 U.S. App. LEXIS 14964 (5th Cir. June 17, 2025) ............................ 32

*Byrd v. United States EPA*, 174 F.3d 239 (D.C. Cir. 1999) ............................ 53, 54

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
   961 F.2d 667 (7th Cir. 1992) ....................................................................... 42

*Ctr. for Biological Diversity v. BP Am. Prod. Co*,
   704 F.3d 413 (5th Cir. 2013) ........................................................................32

*Cornish v. Corr. Servs. Corp.*, 402 F.3d 545 (5th Cir. 2005)................................ 33

*CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526 (D.N.J. 2005)................................ 47

*Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999)................................................ 53

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ........................3, 4

*Doctor's Hosp. v. Se. Med. All.*, 123 F.3d 301 (5th Cir. 1997) ............................. 43

*EEOC v. BDO USA, L.L.P.*, 876 F.3d 690 (5th Cir. 2017)....................................56

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 995 F.3d 993 (2021) .............55

*Elrod v. Burns*, 427 U.S. 347 (1976) .....................................................................16

*Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990)............................................................... 45

*Food Chem. News v. Department of Health & Human Servs.*,
    980 F.2d 1468 (D.C. Cir. 1992) ................................................ 54

*George v. Pacific-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996) ............... 33

*Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998 (S.D. Tex. 1997)...... 44

*Horne v. Flores*, 557 U.S. 433 (2009) ........................................... 43

*In re Terra Int'l*, 134 F.3d 302 (5th Cir. 1998)............................. 56, 57

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv's Servs. Inc.*,
    175 F.3d 848 (10th Cir. 1999) ............................................ 44-45

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*,
    219 F. Supp. 2d 20 (D.D.C. 2002), *aff'd sub nom.*,
    *In re Cheney*, 334 F.3d 1096 (D.C. Cir. 2003),
    *rev'd on other gnds.*, 542 U.S. 367 (2004)................................. 53

*Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holdings, Inc.)*,
    926 F.3d 103 (5th Cir. 2019) ................................................31

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ......................50

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948).....49

*Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*,
    615 F.2d 1372 (5th Cir. 1980) ............................................... 50

*National Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978)................................................. 45, 46, 47

*Pearson v. Shriners Hosps. for Children, Inc.*, 133 F.4th 433 (5th Cir. 2025) ..... 33

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247 (5th Cir. 2021) ....31

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) .........................38

*Pub. Emps. for Env't Responsibility v. Nat'l Park Serv.*,
    Civil Action No. 19-3629 (RC), 2022 U.S. Dist. LEXIS 93204
    (D.D.C. May 24, 2022) .......................................................55

*Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440 (1989) ....................54

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006)................ 43

*Sambrano v. United Airlines*, 45 F.4th 877 (5th Cir. 2022) .....................48

*Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1994),
    *as amended on denial of reh'g* (Jan. 11, 1995) ................................ 34, 38, 39

*Sims v. Jefferson Downs Racing Ass'n*, 778 F.2d 1068 (5th Cir. 1985)................ 36

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................ 43

*Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433 (2017) .......................... 43

*Turner v. Pleasant*, 663 F.3d 770 (5th Cir. 2011) ...................................... 32

*United States v. Garrett*, 571 F.2d 1323 (5th Cir. 1978) ...................................... 57

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) .......................... 49

*Vasquez v. U.S. Xpress, Inc.*, No. 2:24-CV-00289-JRG,
    2024 U.S. Dist. LEXIS 225063 (E.D. Tex. Dec. 11, 2024) ........................ 57

*Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734 (5th Cir. 2015) ..........49

*Walker v. S. Cent. Bell Tel. Co.*, 904 F.2d 275 (5th Cir. 1990) ...............................31

*Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812 (5th Cir. 2004)........................32

**Statutes, Regulations, and Rules**

5 U.S.C. § 702 .....................................................................................................1

5 U.S.C. § 706 .....................................................................................................1

5 U.S.C. § 706(2)(A), (B) and (D).....................................................................56

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1331 .................................................................................................1

28 U.S.C. § 1337 .................................................................................................1

28 U.S.C. § 1361 .................................................................................................1

28 U.S.C. § 1367 .................................................................................................1

42 U.S.C. § 1983 ...............................................................................................35

Clayton Act, Section 4, 15 U.S.C. § 15 .............................................................1

Clayton Act, Section 16, 15 U.S.C. § 26 ...........................................................1

Federal Advisory Committee Act (FACA).......vi, 2, 3, 14, 16, 20, 21, 30, 31, 53-56
    Section 10(b), 5 U.S.C. app. 2, § 10(b) ...................................................54, 56

Sherman Act, 15 U.S.C. §§ 1-2 .................................................29, 31, 46, 47, 48

Sherman Act, Section 2, 15 U.S.C. § 2 ..............................................................50

Tex. Civ. Prac. & Rem. Code § 74.401(c)(1) ...........................................18

Tex. Occ. Code § 155.002 ...........................................................................29

41 C.F.R. § 102-3.145.................................................................................55

77 Fed. Reg. 66670 (Nov. 6, 2012).............................................................19

FED. R. CIV. P. 12(b)(1)....................................................................27, 29, 31, 32

FED. R. CIV. P. 12(b)(6)........................................................................27, 31, 32

FED. R. CIV. P. 26(c)...................................................................................56

**Government Statements and Postings on Its Websites**

Dep't of Homeland Security, Homeland Security Advisory Council
    Disinformation Best Practices and Safeguards Subcommittee,
    Final Report (Aug. 24, 2022) ("*Subcommittee Final Report*"),
    https://perma.cc/M9H6-C6XX .......................................20, 21, 55

DHS Needs a Unified Strategy to Counter Disinformation Campaigns,
    No. OIG-22-58, DHS Inspector General (Aug. 10, 2022)
    https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-58-
    Aug22.pdf .........................................................................................21

DHS Statement, "Following HSAC Recommendation, DHS terminates
    Disinformation Governance Board" (Aug. 24, 2022)
    https://perma.cc/4WVL-Y3D2 .........................................................55

Docinfo by the Federation of State Medical Boards, https://www.docinfo.org/.....42

Interstate Medical Licensure Compact Commission FAQS,
    https://imlcc.com/faqs/ ....................................................................17

Interstate Medical Licensure Compact, "Information For Physicians"
    https://imlcc.com/information-for-physicians/ ..................................41

**Articles, and Public Statements by Defendants**

ABOG, *Dobbs vs. Jackson Women's Health Organization Anniversary
    Statement* (June 27, 2023)
    https://web.archive.org/web/20230627150940/
    https://www.abog.org/about-abog/news-
    announcements/2023/06/27/dobbs-vs.-jackson-women-s-
    health-organization-anniversary-statement ....................................4

ABOG, *Statement Regarding Dissemination of COVID-19 Misinformation*
    (Sept. 27, 2021) ..............................................................................41

ABOG, *Statement Regarding Misinformation and Disinformation and
    Medical Professionalism* (July 7, 2022)
    https://docs.house.gov/meetings/IF/IF02/20220719/114995/HHRG-
    117-IF02-20220719-SD004.pdf ........................................................................4

Michael DePeau-Wilson, "Regulators Move Against Two
    'Misinformation' Doctors," *MedPage* (November 1, 2022)
    https://www.medpagetoday.com/special-reports/exclusives/101529 ..........37

Joint Statement on Dissemination of Misinformation (Sept. 9, 2021)
    https://www.abim.org/media-center/press-releases/joint-statement-
    on-dissemination-of-misinformation/............................................................41

Marty Makary, M.D., *Blind Spots: When Medicine Gets It Wrong, and
    What It Means for Our Health* 186 (Bloomsbury Publishing: 2024)..............3

"Pro-choice advocates to stage rally in Washington today,"
    *Delaware State News* (Oct. 2, 2021) .............................................................23

Sonam Sheth, "WATCH: An abortion provider shut down an anti-choice
    OBGYN for 'spreading medical misinformation' at a House oversight
    hearing" (Sept.  30, 2021)
    https://www.businessinsider.com/abortion-doctor-moayedi-ingrid-
    skop-obgyn-oversight-hearing-video-2021-9 .................................................23

Paul Teirstein, "The Gatekeeper Driving Doctors From Medicine; The
    private American Board of Medical Specialties acts like a regulator,
    hamstringing physicians with endless fees, paperwork and testing,"
    *Wall St. J.*, Opinion (Oct. 19, 2025) ...............................................................3

Testimony by Pierre Kory, M.D., before the U.S. Senate Committee on
    Homeland Security and Governmental Affairs (May 6, 2020)
    https://www.hsgac.senate.gov/wp-
    content/uploads/imo/media/doc/Testimony-Kory-2020-05-06-
    REVISED.pdf ............................................................................................10

Testimony by Pierre Kory, M.D., before the U.S. Senate Committee on
    Homeland Security and Governmental Affairs (Dec. 8, 2020)
    https://www.hsgac.senate.gov/wp-
    content/uploads/imo/media/doc/Testimony-Kory-2020-12-08.pdf ..............10

Kurt Wagner, "In all, Facebook took down more than 20 million pieces
    of content in just over a year," TIME (Aug. 27, 2024).
    https://time.com/7015026/meta-facebook-zuckerberg-covid-biden-
    pressure-censorship/ ......................................................................................7

Mark Zuckerberg's Letter to Chairman Jim Jordan of the Committee on
    the Judiciary, U.S. House of Representatives (Aug. 26, 2024)
    https://www.facebook.com/photo/?fbid=919665486871535&set=
    pcb.919665756871508&locale=en_GB ........................................................7

# JURISDICTIONAL STATEMENT

This appeal is brought under 28 U.S.C. § 1291 from the Amended Final Judgment of the United States District Court for the Southern District of Texas, Galveston Division, which was entered on July 31, 2025. (ROA.1239-40) and, as referenced therein, from its Amended Memorandum Opinion and Order also entered on July 31, 2025. (ROA.1223-38) Plaintiffs-Appellants filed a timely Notice of Appeal on September 26, 2025 (ROA.1241-42), which further appealed the Order entered on June 3, 2025, by the district court to stay discovery. (ROA.1184) Plaintiffs-Appellants do not appeal the ruling on July 29, 2025, which adopted the magistrate judge's recommendation to grant the motion to dismiss filed by the American Board of Family Medicine ("ABFM"). (ROA.1203-04)

The district court had jurisdiction over the federal law claims under 28 U.S.C. §§ 1331, 1337, and 1361, 5 U.S.C. §§ 702, 706, and 15 U.S.C. §§ 15, 26. Supplemental jurisdiction over the claims for tortious interference, contractual violations of due process, and defamation existed below under 28 U.S.C. § 1367.

# STATEMENT OF ISSUES

The issues presented are:

1.     Whether publicly restricting physicians' ability to practice medicine is traditionally a public function.

2.      Whether retaliation against physicians based on their exercise of First Amendment rights, in the form of publicly decertifying them such that they cannot practice in hospitals or insurance networks, amounts to state action.

3.      When monopolists exclude physicians from the market based on viewpoint discrimination, whether antitrust injury exists for standing purposes.

4.      Whether the transparency requirements of the Federal Advisory Committee Act ("FACA") were satisfied by the Biden Administration in failing to disclose documents related to a decision-making process by a FACA committee, which made a recommendation directly to President Biden's Department of Homeland Security Secretary Alejandro Mayorkas.

5.      While assessing alleged state action by private defendants, whether the district court should have allowed discovery from the government to consider pressure imposed by the Biden Administration to censor.

## STATEMENT OF THE CASE

Defendants American Board of Internal Medicine ("ABIM") and American Board of Obstetrics & Gynecology ("ABOG") have perpetrated a new form of censorship, by revoking or threatening to revoke the board certifications of physicians for expressing conservative views on issues such as COVID, abortion, and transgender ideology. The Biden Administration encouraged this, but

discovery was denied to Plaintiffs below and FACA-mandated disclosures were never made.

Once respected, Defendant ABIM is widely criticized today, including by the current FDA Commissioner. *See, e.g.*, Marty Makary, M.D., *Blind Spots: When Medicine Gets It Wrong, and What It Means for Our Health* 186 (Bloomsbury Publishing: 2024) (criticizing a presentation at Johns Hopkins University by the then-CEO of ABIM, Richard Baron; faulting ABIM's "new decertify program" because it is "aimed at removing the board certification of any doctor that does not agree with ABIM leadership positions on certain medical controversies"); Paul Teirstein, "The Gatekeeper Driving Doctors From Medicine; The private American Board of Medical Specialties acts like a regulator, hamstringing physicians with endless fees, paperwork and testing," *Wall St. J.*, Opinion (Oct. 19, 2025) ("Nearly 95% of U.S. physicians hold [board certification from ABMS entities including ABIM], and hospitals and insurers often require it for employment. Some states, such as California, Florida and Texas, fine doctors for calling themselves 'board certified' without a current ABMS credential.").

Meanwhile, Defendant ABOG is aggressively misusing its board certification to chill speech by pro-life physicians, while favoring pro-abortion ones. For pro-life physicians who exercise their First Amendment rights, ABOG threatened the loss of certification in a defiant post-*Dobbs* statement, in which

3

ABOG favorably mentions abortion four times.[1] Meanwhile, ABOG has promised to protect and continue its board certification of physicians who violate state laws in illegally providing abortion by telemedicine and otherwise.[2]

In this lawsuit, Plaintiff Association of American Physicians and Surgeons Educational Foundation ("AAPS") and several physicians challenge the unprecedented retaliation by Defendants ABIM and ABOG against physicians who speak out on matters of public policy. (ROA.679-80 ¶ 1) Using nearly identical terminology and timing, Defendants ABIM and ABOG have infringed on rights vital to public debate and democratic government. (*Id.*) Plaintiff AAPS has been harmed by the chilling effect on its conferences, while Plaintiffs Pierre Kory and Paul Marik (the "Individual Plaintiffs") have been harmed by the retaliation against them by Defendant ABIM. (ROA.679-80 ¶ 1, ROA.683 ¶ 9)

---

[1] ABOG, *Statement Regarding Misinformation and Disinformation and Medical Professionalism* (July 7, 2022) https://docs.house.gov/meetings/IF/IF02/20220719/114995/HHRG-117-IF02-20220719-SD004.pdf (viewed Nov. 29, 2025).

[2] ABOG declared that "ABOG will continue to use discretion when evaluating physicians for certification and continuing certification who may have criminal or civil action taken against them or have adverse actions taken on their medical license solely in response to providing evidence-based reproductive health care including abortions," thereby creating a safe harbor for abortionists who violate the law. ABOG, *Dobbs vs. Jackson Women's Health Organization Anniversary Statement* (June 27, 2023) https://web.archive.org/web/20230627150940/https://www.abog.org/about-abog/news-announcements/2023/06/27/dobbs-vs.-jackson-women-s-health-organization-anniversary-statement (viewed Nov. 29, 2025).

Plaintiffs' lawsuit does not oppose the traditional authority of Defendants ABIM and ABOG (collectively, the "Board Defendants") to confer or deny board certification to young physicians, based primarily on multiple-choice exams as they have traditionally done. (ROA.680 ¶ 2, 686 ¶¶ 17-18, 694 ¶ 49) Instead, this lawsuit challenges Defendants' recent, unprecedented policies of threatened and actual revocation of such earned board certifications in retaliation against statements by a physician on matters of public policy. (ROA.680-81 ¶ 3)

## A. Factual Background

Defendants ABIM and ABOG have certification monopolies based primarily on written multiple-choice examinations about medicine. (ROA.680 ¶ 2) Though ostensibly nonprofit and non-partisan, the Board Defendants were outspokenly allied with the Biden Administration on fundamental issues including opposition to ivermectin as early treatment for COVID-19, support of mandatory COVID-19 masking, lockdowns, and vaccination, and also abortion rights and transgender procedures. (*Id.*)

The Board Defendants announced their unprecedented campaign to take action against certifications earned by physicians, based on their public statements, which have included retaliating against physicians based primarily on their testimony before legislative committees. (ROA.680-81 ¶ 3) Defendant ABIM sent letters to physicians threatening them with revocation of their earned board

5

certifications based on the exercise by those physicians of their First Amendment rights on matters of public policy, and has revoked several board certifications. (*Id.*) Defendant ABOG publicly warned physicians against making statements against abortion, lest they have their earned board certifications revoked by ABOG if it disagrees with such statements. (*Id.*) In at least one congressional hearing, a Democratic congressman and his supportive witness – both on the same side favoring abortion rights – had an apparently coordinated exchange that threatened revocation by ABOG of an opposing witness's board certification for her testimony against abortion. (*Id.*) In at least one case, retaliation by Defendant ABIM was based on comments a physician made to a church congregation during a religious gathering. (ROA.681 ¶ 4) ABIM revoked its certification of Plaintiffs Kory and Marik for making statements about the COVID-19 pandemic with which Defendants disagreed. (ROA.681-82 ¶ 5)

Although only official state medical boards have the proper authority to regulate the practice of medicine, certifications by the Board Defendants constitute a *de facto* essential credential for practicing in most hospitals and participating in most networks. (ROA.682 ¶ 6) By threatening to revoke the board certification of physicians, and actually doing so, the Board Defendants engage in state action, and intentionally and improperly chill speech by physicians without the political accountability of official state medical boards. (*Id.*)

Alejandro Mayorkas ("Mayorkas"), when he was a Cabinet official in the

Biden Administration, monitored and took actions against what a federal agency

considered to be misinformation and disinformation. (ROA.682 ¶ 7) As Meta

Platforms (formerly Facebook) CEO Mark Zuckerberg apologized in a letter in

2024 to the Chairman Jim Jordan (R-OH) on the Committee on the Judiciary of the

U.S. House of Representatives:

> In 2021, senior officials from the Biden Administration, including the White
> House, repeatedly pressured our teams for months to censor certain COVID-
> 19 content, including humor and satire. … I believe the government pressure
> was wrong, and I regret that we were not more outspoken about it."[3] (*Id.*)

"In all, Facebook took down more than 20 million pieces of content in just

over a year."[4] (ROA.682-83 ¶ 8) Likewise, Facebook imposed censorship-type

disclaimers against AAPS postings during the COVID era, and videos from

Plaintiff AAPS were taken down from YouTube based on similar pressure by

federal government officials. (*Id.*)

Defendants' actions harm the conferences and fundraising efforts by

Plaintiff AAPS, which depend on robust freedom of speech in-person and on the

---

[3] Letter by Mark Zuckerberg to Chairman Jim Jordan of the Committee on the
Judiciary, U.S. House of Representatives (August 26, 2024).
https://www.facebook.com/photo/?fbid=919665486871535&set=pcb.9196657568
71508&locale=en_GB (viewed Nov. 27, 2025).
[4] Kurt Wagner, "In all, Facebook took down more than 20 million pieces of content
in just over a year," TIME (Aug. 27, 2024).
https://time.com/7015026/meta-facebook-zuckerberg-covid-biden-pressure-
censorship/ (viewed Oct. 26, 2025).

internet. (ROA.683 ¶ 9) Presenters and outspoken participants at these videoed

conferences co-sponsored by AAPS have received letters threatening revocation of

their earned board certifications, for statements they made at AAPS co-sponsored

conferences and elsewhere. (*Id.*)

Defendants' actions have intentionally harmed the Individual Plaintiffs by

interfering with their ability to practice in hospitals, for which board certification

by the Board Defendants is typically required, and to be in many insurance

networks which also require board certification. (ROA.683 ¶ 10) In addition,

Defendants have chilled the speech of the Individual Plaintiffs, contrary to their

constitutional rights. (*Id.*)

The common goal of all the Defendants has been, and continues to be, to

censor or chill public statements made by physicians who are frequently on the

side of the political spectrum opposite to Defendants. (ROA.683 ¶ 11) The Board

Defendants have been acting in concert with officials of the federal government in

retaliating against physicians for being opposed to certain policies. (*Id.*)

### The Plaintiffs

Founded in 1996, Plaintiff Association of American Physicians and

Surgeons Educational Foundation ("AAPS") is a non-profit organization

incorporated under the laws of Arizona and headquartered in Tucson, Arizona.

(ROA.683-84 ¶ 12) AAPS co-sponsors medical education conferences, including

subsidizing attendance by medical students and residents at such conferences. (*Id.*)

AAPS posts videos on the internet of presentations made by physicians and others

at its conferences, including participation by attendees in extensive Q&A and

discussions. (*Id.*) AAPS raises money based on these activities. (*Id.*)

Plaintiff Pierre Kory, M.D., M.P.A. ("Kory"), is a physician licensed in good

standing in Wisconsin, California and New York. (ROA.684 ¶ 13) He was Board

Certified by the ABIM in Internal Medicine in 2005, Pulmonary Disease in 2007

and Critical Care Medicine in 2008, all in good standing until they were revoked

on August 8, 2024, by ABIM (hereinafter, "ABIM Decisions"). (*Id.*) Dr. Kory is a

former Associate Professor and Chief of the Critical Care Service at the University

of Wisconsin, and has published more than 50 peer-reviewed papers and 17 book

chapters, and served as senior editor of an award-winning textbook now published

in its 2nd edition and translated into 7 languages. (*Id.*) Dr. Kory has extensive

experience treating ambulatory and hospitalized COVID-19 patients and has

published more than 12 research papers on COVID-19. (*Id.*) Dr. Kory has

presented at medical conferences and testified as an expert witness in Texas. (*Id.*)

He is listed as an expert witness in a case before the Texas Medical Board that is

affected by the ABIM revocation of his certification. (*Id.*) He has never been sued

for malpractice and is currently a resident of Florida. (*Id.*)

Plaintiff Kory became a focus of the ire of Defendants because he was

actively exercising his right to petition government, for example testifying before the U.S. Senate Committee on Homeland Security and Governmental Affairs, as chaired by Senator Ron Johnson (R-WI) at the time. Dr. Kory testified on May 6, 2020,[5] regarding the use of corticosteroids in COVID patients which was not widely recognized as beneficial until later, and on December 8, 2020,[6] in support of the use of ivermectin. (ROA.684-85 ¶ 14)

Plaintiff Paul E. Marik, M.D., FCCM, FCCP ("Marik"), is a physician who was Board Certified in Internal Medicine in 1998 and Critical Care Medicine in 2009; he was placed on inactive status when he retired from clinical practice but remained in good standing until his certifications were revoked on August 8, 2024 by the ABIM Decisions, which were virtually identical against both him and Plaintiff Kory. (ROA.685-86 ¶ 15) Dr. Marik is a resident of the State of Virginia, where he voluntarily allowed his medical license to lapse. (*Id.*) Dr. Marik has been an expert witness and presenter at medical conferences in Texas. (*Id.*) He has written over 500 peer reviewed journal articles, 80 book chapters, authored four critical care books, and is the senior editor of the only published textbook on COVID-19. (*Id.*) He has been cited over 52,900 times in peer-reviewed

---

[5] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Testimony-Kory-2020-05-06-REVISED.pdf (viewed Nov. 27, 2025).

[6] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Testimony-Kory-2020-12-08.pdf (viewed Nov. 27, 2025).

publications, has a prestigious H-index of 110, and has delivered over 350 lectures at international conferences and visiting professorships. (*Id.*) He also has received numerous teaching awards, including the National Teacher of the Year award by the American College of Physicians in 2017. (*Id.*) He is the second-most published critical care physician in the world and has co-authored 18 papers on therapeutic approaches to COVID-19. (*Id.*) He has delivered conference presentations, expert testimony and undertaken other professional activities in Texas that are affected by the ABIM's revocation of his board certification. (*Id.*)

### The Board Defendants and Their Retaliation Against Physicians

Defendant ABIM is a nonprofit organization based in Philadelphia, Pennsylvania, which certifies physicians nationwide in the specialty of internal medicine, primarily on the basis of performance on a written multiple-choice examination. (ROA.686 ¶ 17)

Defendant ABOG is a nonprofit organization having its principal place of business in Dallas, Texas. (ROA.686 ¶ 18) ABOG certifies physicians nationwide in the specialty of obstetrics and gynecology, also primarily on the basis of performance on a written multiple-choice examination. (*Id.*)

The Board Defendants certify physicians in specialties based primarily on their performance on written multiple-choice examinations administered near the beginning of their professional careers. The Board Defendants have no meaningful

academic affiliations, and no demonstrable expertise in anything related to

COVID-19, its treatment, vaccination of pregnant women, mask mandates,

lockdowns, harm caused by abortion, or transgender operations on children.

(ROA.694 ¶ 49)

In its own Policies & Procedures, ABIM states that its primary grounds for

revoking its board certification is if a physician's license to practice medicine has

been restricted, suspended, or revoked, or if he has engaged in "misconduct in

connection with an ABIM examination." *ABIM Policies & Procedure for

Certifications* ("*ABIM Policies*"), at 18. (ROA.695-96 ¶ 53)

On September 27, 2021, Defendant ABOG announced that it would take

action against a physician's board certification for not "behaving professionally

with patients, families, and colleagues across health professions." (ROA.696 ¶ 55)

Then ABOG's statement refers to "pregnant people" three times and "pregnant

individuals" once, as though professionalism requires referring to pregnant women

with a gender neutral term and fully accepting transgender procedures in

connection with pregnancy. (*Id.*)

On July 7, 2022, Defendant ABOG announced that it might revoke board

certifications of physicians opposed to abortion if they provide "false or misleading

information" that is "used to advocate for legislation, regulations, criminal code,

and health policy." (ROA.696-97 ¶ 56) This infringes on the constitutional rights

of physicians to participate fully and candidly in the processes of legislation and public policy decision-making. (*Id.*) What ABOG considers to be "false or misleading" is almost any statement in opposition to abortion. (*Id.*) ABOG denies harm caused by abortion, even harm reported in peer-reviewed published medical studies. (*Id.*) ABOG is deliberating chilling free speech on this issue by physicians based on viewpoint, and ABOG's threats harm Plaintiffs by interfering with presentations and participation at conferences. (*Id.*)

The Board Defendants' conduct appears to be coordinated, in a concerted attempt to advance a partisan political agenda. (ROA.697 ¶ 57) Upon information and belief, Board Defendants sought to appease, or respond to pressure or requests by, Biden Administration officials to censor the expression of independent viewpoints by physicians. (*Id.*)

### Ongoing Injuries to Plaintiffs

Defendants are causing a direct monetary harm to Plaintiff AAPS by imposing a chilling effect on speakers at its conferences, which has a corresponding decrease in attendance at those events, lost internet traffic with respect to a reduction in videos posted from those conferences, and a resultant corresponding decline in conference fees and donations to AAPS. (ROA.688 ¶ 25)

Defendants cause ongoing harm to the Individual Plaintiffs by chilling what they can say amid threatened and actual retaliation against their board

13

certifications, which reduces opportunities for these physicians, interferes with their ability to practice medicine, and harms their professional reputations. (ROA.688-89 ¶ 26)

The Board Defendants engage in tortious conduct by misusing their monopoly power over board certification which, while based primarily on performance on written multiple-choice examinations, subjects its certificate holders to public sanctions including revocation of their certifications in order to chill and interfere with the presentation of alternative viewpoints at medical conferences and on the internet, including interference with these activities by Plaintiffs. (ROA.689 ¶ 27)

Then-DHS Secretary Mayorkas failed to comply with FACA, and this continues to harm Plaintiffs in violation of the Administrative Procedure Act ("APA"). (ROA.689 ¶ 28)

## Monopoly Power and Antitrust Injury

The Board Defendants have monopoly power in their respective specialties, as each controls an estimated 80% of the certification of physicians in their corresponding specialties. (ROA.692 ¶ 38, quoting a statement by an ABIM official) By purpose and effect, the Board Defendants chill speech by physicians on controversial matters of government policy. (ROA.692 ¶ 39) The Board Defendants know that their monopoly power has a coercive effect on physicians,

who risk losing their medical careers if the Board Defendants revoke their board certification. (ROA.692 ¶ 40) The Board Defendants intend to guide and control public discussion about controversial government policies with the actions they threaten and take against physicians based on their viewpoints. (ROA.692 ¶ 41) The Board Defendants are abusing their monopoly power with their actions, which would not have their intended affect in the absence of that monopoly power. (ROA.692 ¶ 42) Censorship of speech is the Board Defendants' intended result of their actions. (ROA.692-93 ¶ 43)

The speakers and attendees at AAPS conferences, who are videoed with postings subsequently made on the internet, would be more candid and outspoken if the Board Defendants were not allowed to retaliate without due process against them based on viewpoint discrimination. The AAPS conferences would be more lively and effective, and better able to attract attendees and raise funds. (ROA.693 ¶ 44)

Plaintiffs Kory and Marik have been directly harmed by the Board Defendants' actions, as their board certifications have been taken from them due to their speech. This severely injures their professional careers, rendering it virtually impossible for them to practice on a medical staff of a hospital or be part of many insurance networks, and intentionally undercutting their ability to speak credibly on critical public health matters. (ROA.693 ¶ 45)

**Irreparable Harm and Inadequacy of Alternate Remedies**

Plaintiffs have First Amendment injuries to their rights of freedom of speech, for which the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Accordingly, Plaintiffs have suffered – and continue to suffer – irreparable harm. (ROA.693 ¶ 47)

Secretary Mayorkas failed to make documents public concerning his termination of the Disinformation Governance Board, in violation of FACA. (ROA.693-94 ¶ 48) Plaintiffs suffer ongoing injury because Mayorkas's final agency actions result in an infringement on Plaintiffs' rights to have administrative compliance by federal agencies with the mandates of FACA, through application of the APA. (ROA.693-94 ¶ 48)

**State Action**

The practice of medicine is a highly regulated field. (ROA.697 ¶ 58) Governments have delegated state functions to the Board Defendants in connection with medical licensure, which is exclusively a governmental function. (ROA.697 ¶ 59) Specifically, a total of 40 states, plus Washington D.C. and Guam, have enacted the Interstate Medical Licensure Compact (IMLC) to grant medical licenses in many states on an expedited basis. (ROA.697 ¶ 60) "Eligible physicians can qualify to practice medicine in multiple states by completing just one

application within the Compact, receiving separate licenses from each state in which they intend to practice." (*Id.*, quoting IMLC Commission FAQS at https://imlcc.com/faqs/)

As set forth on the IMLC website, state licensure under the IMLC is limited to those who "[h]old a current specialty certification or time-unlimited certification by an ABMS [American Board of Medical Specialties] or AOABOS [American Osteopathic Association Bureau of Osteopathic Specialists] board." (ROA.697-98 ¶ 61) This refers to the Board Defendants, for all who hold a medical degree, with respect to the large specialties of internal medicine (ABIM) and obstetrics & gynecology (ABOG). (*Id.*)

Accordingly, 40 states (including Texas) have delegated the determination of who is eligible for state licensure via the IMLC to the Board Defendants. (ROA.698 ¶ 62) Revocation of certification by the Board Defendants thereby disqualifies a physician from being eligible for licensure via the IMLC, despite satisfying all other requirements for licensure. (ROA.698 ¶ 63) Ineligibility for the IMLC, as caused by the Board Defendants, thereby precludes the Individual Plaintiffs from job opportunities in Texas (and elsewhere). (ROA.698 ¶ 64) In addition, the Texas Medical Board website lists, as part of each physician's professional profile, his certification status with ABIM, ABOG, and other ABMS-affiliated boards for other specialties. (ROA.698 ¶ 65)

Meanwhile, the Federation of State Medical Boards ("FSMB") is comprised of, funded, and controlled by state medical boards. (ROA.698 ¶ 66) In 2021-22 the FSMB Chairman was Kenneth B. Simons, M.D., who had been the Chairman of the Wisconsin Medical Examining Board (MEB), which is a state entity. (ROA.698-99 ¶ 67) At Dr. Simons' request, the FSMB developed and issued a statement against so-called misinformation and disinformation, which included Dr. Simons as a co-signatory. (ROA.699 ¶ 68) The Board Defendants then agreed with the FSMB; other health organizations including the umbrella organization for the Board Defendants, ABMS, agreed with FSMB on this by threatening adverse actions against physicians based on their public statements about matters of public policy. (ROA.699 ¶ 69) Indeed, the FSMB, which was founded in 1912, was a co-founder of the umbrella group ABMS in 1933, which then three years later helped found Defendant ABIM. ABMS includes Defendants ABIM and ABOG as members. (ROA.699 ¶ 70) The FSMB is an associate member of the ABMS. (*Id.*)

In addition, Texas law permits a medical doctor to publicize that he is board certified only if he holds board certification from the ABIM, ABOG, and other ABMS-affiliated boards for other specialties. (ROA.699-70 ¶ 71) In Texas medical liability cases, the legislature has expressly pointed to board certification as an essential consideration in weighing the qualifications to testify as an expert. Tex. Civ. Prac. & Rem. Code § 74.401(c)(1). (ROA.670 ¶ 72) This incorporates board

certification into the Texas system of justice as a matter of law. (*Id.*) For at least the fiscal years 2013 and 2014, Medicare also provided higher reimbursements to physicians in internal medicine who held board certification from Defendant ABIM. 77 Fed. Reg. 66670, 66673. (ROA.700 ¶ 73)

The Board Defendants report their retaliatory actions against physicians to the National Practitioner Data Bank, which is a database maintained by the federal government that delegates authority and relies entirely on the reporting entities to conduct a genuine peer review of a physician before filing an adverse report against him or her. (ROA.700 ¶ 74) Reports in the Data Bank have a devastating impact on the targeted physicians, such that they are typically prevented by an adverse report from ever obtaining new employment in their specialty afterward. (*Id.*)

The Board Defendants affirmatively sought and lobbied for the foregoing delegations to them by governments. In no instance has any of the Board Defendants disclaimed any of these delegations and interrelation between governments and themselves. (ROA.700 ¶ 75)

The vast majority of hospitals require board certification as a condition of medical staff privileges, which is a requirement also affirmatively sought by the Board Defendants to increase their revenue and power. (ROA.701 ¶ 76) Likewise, many insurance networks require board certification as a condition of

reimbursement. (*Id.*)

In sum, Board certification is tantamount to state medical licensure for many physicians. (ROA.701 ¶ 77)

### The Government Defendant

Defendant Kristi Noem is the current Secretary of the U.S. Department of Homeland Security (DHS) (ROA.687 ¶ 20), but the alleged wrongdoing at issue here was under the prior administration, when Defendant Alejandro Mayorkas was the Secretary. (ROA.682 ¶ 7, ROA.687 ¶ 21, ROA.689 ¶ 28, ROA.693-94 ¶ 48, ROA.705-07 ¶¶ 99-107, ROA.723-25 ¶¶ 170-81)

The Homeland Security Advisory Council ("HSAC"), which itself is subject to FACA (ROA.702-03 ¶ 85), appointed a subcommittee (the "Subcommittee") that was comprised of six members. Two of them – fully one-third of this Subcommittee – were at the time attorneys at the very same law firm of Wilmer Cutler Pickering Hale and Dorr, LLP, in its same Washington, D.C., office. *Subcommittee Final Report*, pp. 26-28. (ROA.704-05 ¶ 95)[7] This Subcommittee did not comply with the transparency and other requirements of FACA. (ROA.705 ¶ 98)

The Subcommittee issued its report on August 24, 2022 – the very same day

---

[7] Homeland Security Advisory Council Disinformation Best Practices and Safeguards Subcommittee Final Report (August 24, 2022) ("*Subcommittee Final Report*"), https://perma.cc/M9H6-C6XX (viewed Nov. 27, 2025).

that then-DHS Secretary Mayorkas, immediately thereafter, made and announced his decision to disband the DGB. (ROA.705 ¶ 99) The *Subcommittee Final Report*, on which Mayorkas relied in making his decision to disband DGB, called for DHS to develop "a more strategic approach to disinformation," such that "DHS 'develop a unified strategy to counter disinformation campaigns that appear in social media.'" *Subcommittee Final Report* at 6 & n.1, citing DHS Needs a Unified Strategy to Counter Disinformation Campaigns, No. OIG-22-58, DHS Inspector General (Aug. 10, 2022).[8] (ROA.705-06 ¶ 100)

The timing of Mayorkas's final decision in disbanding the Disinformation Governance Board was immediately following the recommendation of the Subcommittee of HSAC, rather than a recommendation by HSAC itself. (ROA.707 ¶ 105) This process of the Subcommittee advising Mayorkas brought the Subcommittee within the scope of FACA and its requirements because ***the Subcommittee directly advised Mayorkas as the Secretary of DHS***. (*Id.*) Yet the Subcommittee failed to comply with any of the requirements of FACA for transparency. (ROA.707 ¶ 106)

### Defendants' Actions Against Plaintiff AAPS

Defendants' censoring and disfavoring of freedom of speech adversely

---

[8] https://perma.cc/M9H6-C6XX, linking to https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-58-Aug22.pdf (viewed Oct. 29, 2025).

affects AAPS and causes it losses in financial support, in the form of decreased attendance and outspokenness at its conferences and reduced contributions to it. (ROA.707-08 ¶ 110)

For example, a vocal meeting attendee who speaks out at AAPS's videoed conferences is being retaliated against by Defendant ABIM based primarily on a presentation she made during a religious gathering of her own church. (ROA.708 ¶ 111) That was apparently videoed and posted by someone else on the internet, and Defendant ABIM is threatening the revocation of her board certification due to her comments as part of that religious ceremony. (*Id.*) The ongoing action by ABIM against her, which has persisted for more than a year, has had a chilling effect on her statements at AAPS meetings, to the detriment of the candor at AAPS's conferences and AAPS's constitutional right to hear. (*Id.*)

Two highly acclaimed speakers at AAPS conferences – both having impeccable academic credentials and a lifetime of achievement in medicine – have been subjected to retaliation by Defendant ABIM such that it has had a chilling effect on their candor and outspokenness in their presentations at AAPS conferences. (ROA.708 ¶ 112)

A speaker at an AAPS conference in 2023, in Texas, was previously confronted during a congressional hearing in apparently a coordinated attempt by a congressman and another witness to use Defendant ABOG's threat of retaliation

against her. (ROA.709-10 ¶ 115) The AAPS conference speaker stated at the

hearing that there was a lack of full reporting of harm from abortion. (*Id.*) Then

Democratic Rep. Gerald Connolly (VA) and a subsequent witness, both favoring

abortion in contrast with the AAPS speaker's opposition to it, reportedly had the

following exchange in misuse of ABOG's threat against the AAPS speaker:

> "What do you know about complications and deaths from licensed clinics
> that provide medically supervised care with respect to abortions?"
> [Democratic Rep. Gerald Connolly (VA)] asked Dr. Ghazaleh Moayedi, a
> board-certified abortion provider who was also testifying at the hearing.
>
> Moayedi didn't mince words, replying, "I'd like to first remind all OBGYNs
> that the American Board of OBGYNs has recently warned that spreading
> medical misinformation can result in loss of board certification."[9]

(*Id.*)

Rep. Connolly, a supporter of abortion rights, next asked the witness to

elaborate further on that "misinformation" and decertification assertion against the

AAPS conference speaker. (*Id.*) This use of ABOG's threat of retaliation against a

witness at a congressional hearing had an intimidating, chilling effect on candor

about abortion by ABOG-certified physicians, including this physician as she

subsequently made a presentation at an AAPS conference. (*Id.*)

---

[9] Sonam Sheth, "WATCH: An abortion provider shut down an anti-choice
OBGYN for 'spreading medical misinformation' at a House oversight hearing"
(Sept. 30, 2021). https://www.businessinsider.com/abortion-doctor-moayedi-
ingrid-skop-obgyn-oversight-hearing-video-2021-9 (viewed Nov. 27, 2025); *see
also* "Pro-choice advocates to stage rally in Washington today," *Delaware State
News* (Oct. 2, 2021).

23

The speakers and attendees at AAPS conferences are nearly entirely physicians and other medical practitioners, who seek candid discussion without any distortions caused by censorship, or any chilling effects from censorship. (ROA.710 ¶ 116) Defendants' retaliation against speakers at AAPS conferences injures AAPS and chills its First Amendment freedom of speech rights, which broadly include the right to hear. (ROA.707 ¶ 109) The full success of AAPS's conferences depends on candor of the presentations by physicians and comments by attendees. (ROA.710 ¶ 117)

**ABIM's Revocation of Plaintiffs Kory's and Marik's Certifications**

Defendant ABIM held a joint hearing and issued substantively identical ABIM Decisions that revoked the board certifications of Plaintiffs Kory and Marik concerning statements they made about the availability of ivermectin to treat COVID. (ROA.710 ¶ 118-19) Defendant ABIM alleged that their statements were false, inaccurate and misleading (*id.*), in violation of ABIM's "False or Inaccurate Medical Information" policy. *ABIM Policies* at 19. (ROA.710-11 ¶ 120)

ABIM cited as part of its basis for revocation that Plaintiffs Kory and Marik were founding members of the Front Line COVID-19 Critical Care Alliance (FLCCC),[10] an organization that was formed by leading critical care specialists

---

[10] After the initiation of this lawsuit, the FLCCC subsequently changed its name to the Independent Medical Alliance (IMA). https://imahealth.org/about/ (viewed Nov. 27, 2025).

who are dedicated to developing highly effective treatment protocols to prevent the transmission of COVID-19, and to improve the outcomes for patients ill with the disease. (ROA.716-17 ¶ 138)

ABIM's revocations were retaliation against Plaintiffs Kory and Marik for exercising their right of freedom of speech and for taking positions contrary to the ABIM's public positions. (ROA.717 ¶ 139) Florida Surgeon General Joseph Ladapo, M.D., is board certified by Defendant ABIM in Internal Medicine. (ROA.717 ¶ 141) Yet ABIM has not taken any adverse action against Dr. Ladapo even though his positions, as Surgeon General of the third most populous state in the United States, are substantially identical to the positions for which Plaintiffs Kory and Marik were decertified by ABIM. (*Id.*)

As to Defendant ABOG, on July 7, 2022, it announced that it might revoke board certifications of physicians opposed to abortion if they provide "false or misleading information" that is "used to advocate for legislation, regulations, criminal code, and health policy." (ROA.696 ¶ 56) ABOG denies harm caused by abortion, even harm reported in peer-reviewed published medical studies. (ROA.696-97 ¶ 56) ABOG is chilling free speech on this issue by physicians, and harming Plaintiff AAPS by interfering with presentations at its conferences. (*Id.*)

**B. Relevant Procedural History**

Plaintiff AAPS filed its initial Complaint on July 12, 2022. (ROA.15-44) On May 16, 2023, the district court issued its Opinion and Order granting the Board Defendants' motions to dismiss. (ROA.415-30) On May 23, 2023, the district court rendered a separate Opinion and Order granting the government's motion to dismiss (ROA.431-42) Plaintiff timely filed its Notice of Appeal on July 13, 2023. (ROA.444-45)

This Court reversed in part, in a published opinion dated June 3, 2024. *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383 (5th Cir. 2024). On remand, Plaintiff AAPS moved for leave on October 21, 2025, to amend the complaint to add the Individual Plaintiffs as parties (ROA.499-657), which the district court granted on January 27, 2025 (ROA.678). Plaintiffs then filed their Amended Complaint on January 29, 2025. (ROA.679-737)

The Board Defendants again moved to dismiss on March 14, 2025 (ROA.752-922) and the government likewise moved on March 27, 2025 (ROA.923-49), which Plaintiffs timely opposed on April 4 and 17, 2025. (ROA.950-1032, 1122-48) While these motions were pending, Plaintiffs sought a document production by the government, but the district court granted without explanation the government's motion to stay discovery which had the effect of denying it entirely to Plaintiffs below. (ROA.1184)

26

On July 29, 2025, the district court adopted the magistrate judge's recommendation to dismiss Plaintiffs' claims against Defendant ABFM, for lack of personal jurisdiction, which Plaintiffs do not challenge on appeal. (ROA.1203-04, 1239) Then, on July 30, 2025, the district court *sua sponte* dismissed Plaintiffs' claims against Defendant ABIM for lack of personal jurisdiction, despite how ABIM had waived any objection to personal jurisdiction. (ROA.1205-20) Apparently recognizing its own error about this, the district court *sua sponte* vacated its opinion the following day, and replaced it with an entirely different basis for dismissing the claims against Defendant ABIM. (ROA.1223-38)

The district court thereby entered its amended opinion granting all of the Defendants' motions to dismiss the entire Amended Complaint on July 31, 2025 (ROA.1223-38), and entered a final judgment on the same day (ROA.1239). On September 26, 2025, Plaintiffs AAPS, Kory and Marik (not Plaintiff Karl N. Hanson) filed their timely Notice of Appeal. (ROA.1241-42)

### C. Rulings Presented for Review

The district court rendered a final judgment while dismissing all of the claims, based on FED. R. CIV. P. 12(b)(6) for Defendants ABIM and ABOG and Rule 12(b)(1) for Defendant Noem. (ROA.1239-40) (The district court also dismissed the claims against the American Board of Family Medicine based on a lack of personal jurisdiction, which Plaintiffs do not contest on appeal.)

As to Defendants ABIM and ABOG, the district court found a lack of state action. The lower court articulated the familiar three-pronged test for state action, but then failed to apply the public function test and instead merely found that "plaintiffs do not sufficiently plead the state delegated, coerced, or acted interdependently with ABIM and ABOG." (ROA.1232) The district court held that "the plaintiffs devote the bulk of their argument to stressing the importance of board certification in practicing medicine" – i.e., the public function test – but the court held that "[t]his is not enough to plausibly plead that ABIM and ABOG *are* state actors." (ROA.1230, emphasis in original). Relying on a nearly 50-year-old decision concerning the unrelated certification of harness horse racing drivers, the district court held that "significance 'does not alone render [the board-defendants'] decisions state action.'" (ROA.1230-31, quoting *Bailey v. McCann*, 550 F.2d 1016, 1019 (5th Cir. 1977)). The district court reasoned further that:

> And no matter how many doors board certification opens for physicians, such as through greater hospital-staffing access or expanded insurance-network compatibility, ABIM and ABOG still have no power to issue the licenses which permit one to practice medicine in the State. A state's adoption of a private board's standards as part of a State regulatory scheme" is therefore no more state action by that organization than is the adoption of State regulations by a wholly private organization.

(ROA.1231, citations and inner quotations omitted)

As to Plaintiffs' antitrust claims, the district court found a lack of antitrust injury "[b]ecause physicians without board certification can still legally practice

medicine and voice their medical opinions, Tex. Occ. Code § 155.002, the plaintiffs have not sufficiently pleaded an antitrust injury or established antitrust standing. Their Sherman Act claims are accordingly dismissed." (ROA.1237) The lower court also expressly declined, at this motion to dismiss stage, to recognize that censorship by monopolists may constitute antitrust injury. (ROA.1236 n.4) The district court made no reference to the fact that in OBGYN and many specialties, privileges to practice in a hospital are essential for these physicians to make a living and, without board certification by Defendants, physicians are excluded from hospitals (and insurance networks).

The district court also dismissed Plaintiffs' tortious interference and defamation claims on the grounds that neither were alleged as fully as the court felt was necessary. As to tortious interference, the district court held that "plaintiffs fail to supply any supporting facts that would allow a tortious-interference claim to survive a motion to dismiss." (ROA.1232-33). Similarly, the district court dismissed the defamation claims by finding that Plaintiffs failed to allege in "a non-conclusory fashion the 'specific allegedly false and defamatory statements' ABIM said or wrote." (ROA.1237, quoting ABIM's argument).

As to Defendant Noem, the district court granted her motion to dismiss under Fed. R. Civ. P. 12(b)(1) based on mootness. (ROA.1227-28). Indeed, President Trump has replaced the members of the Homeland Security Advisory

Council ("HSAC") such that Plaintiffs' claim of a lack of balance on that FACA-governed group is moot now.[11] But the lack of compliance by the Biden Administration with FACA transparency and disclosure requirements is not moot, and the district court acknowledged this FACA claim by Plaintiffs without addressing it. (ROA.1227 n.2)

## SUMMARY OF ARGUMENT

Freedom of speech is chilled; public discourse by physicians is undermined; and the democratic process suffers due to the misuse by Defendants ABIM and ABOG of their board certification monopolies to censor physicians. Under the rationale used by the district court below, these and similar Defendants could revoke needed board certifications by retaliating with impunity based on a physician's views on abortion, or even his religious objections to vaccination.

Fortunately, several legal doctrines should provide a remedy against this abuse of power. First, these Defendants are engaging in a public function when they sharply restrict the ability of a physician to practice medicine, which is the effect of revoking board certification. While the Board Defendants need not be considered state actors for their traditional role in granting certification based on multiple-choice exams, their new program of decertifying physicians based on their outspokenness is state action because the public restriction of a physician's

---

[11] https://www.dhs.gov/homeland-security-advisory-council-members (viewed Nov. 27, 2025).

ability to practice is a public function. Second, this conduct by the Board

Defendants violates the Sherman Act by interfering with the free market and

reducing patient choice.

Plaintiffs' claim against the government for its violation of FACA is not

moot, because it has still not complied in connection with its role in this.

## ARGUMENT

### I.   Standard of Review.

Review is de novo here, because the dismissal below was based on FED. R.

CIV. P. 12(b)(6) as to Defendants ABIM and ABOG, and on Rule 12(b)(1) as to

Defendant Noem.

"We review a district court's decision on a 12(b)(6) motion de novo,

accepting all well-pleaded facts as true and viewing those facts in the light most

favorable to the plaintiff." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007)

(citing *Walker v. S. Cent. Bell Tel. Co.*, 904 F.2d 275, 276 (5th Cir. 1990)). This

Court has reiterated that:

> We review orders on 12(b)(6) motions to dismiss for failure to state a
> claim *de novo*. *Life Partners Creditors' Tr. v. Cowley (In re Life Partners
> Holdings, Inc.)*, 926 F.3d 103, 116 (5th Cir. 2019). We accept all well-
> pleaded facts as true, viewing them in the light most favorable to the
> plaintiff. *Arnold v. Williams*, 979 F.3d 262, 265 n.1, 266 (5th Cir. 2020).

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 253 (5th Cir. 2021).

This same de novo standard of review applies to the district court's dismissal

based on Rule 12(b)(1). "A district court's dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) or for failure to state a claim pursuant to Rule 12(b)(6) is reviewed de novo." *Ctr. for Biological Diversity v. BP Am. Prod. Co*, 704 F.3d 413, 421 (5th Cir. 2013) (citing *Ballew v. Cont'l Airlines, Inc*., 668 F.3d 777, 781 (5th Cir. 2012); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)). Meanwhile, the denial of discovery below is subject to an abuse of discretion standard of review on appeal here. *See Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 817 (5th Cir. 2004).

## II. Publicly Restricting Physicians' Ability to Practice Medicine is a Public Function, and Defendants ABIM and ABOG Engage in State Action When They Decertify Physicians Based on Ideology.

As this Court has explained:

Under the state action prong, a private entity can qualify as a state actor in a few limited circumstances. Those include, for example (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action, or (iii) when the government acts jointly with the private entity. They also include (iv) when the private entity is entwined with governmental policies, or when government is entwined in its management or control. Deciding whether a deprivation of a protected right falls within one of these categories begins by identifying the specific conduct of which the plaintiff complains, as a ***defendant may be a state actor for some purposes but not for others***.

*Bridges v. Methodist Hosp.*, No. 24-20483, 2025 U.S. App. LEXIS 14964, at *6 (5th Cir. June 17, 2025) (emphasis added, cleaned up).

Defendants ABIM and ABOG engage in a public function when they decertify physicians based not on performance on the certification exams, but on their statements on matters of public concern such as providing testimony.

### A. A Defendant May Be a State Actor for Some Purposes, But Not Others, as Defendants ABIM and ABOG Are.

As this Court reiterated a few months ago, "a defendant 'may be a state actor for some purposes but not for others.'" *Pearson v. Shriners Hosps. for Children, Inc.*, 133 F.4th 433, 444 (5th Cir. 2025) (quoting *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 550 (5th Cir. 2005), quoting *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1230 (9th Cir. 1996)).

Despite these clear precedents, the district court instead treated Defendants ABIM and ABOG as all-or-nothing on the issue of whether they are state actors. No one here is seeking a finding of state action for the traditional role played by these Defendants in providing board certification exams to young physicians, in order to establish their medical proficiency in their fields of specialty. The district court erred in viewing this case as an attempt to declare *all* of board certification as state action, and in merely deciding whether ABIM and ABOG are inherently state actors for *all* of their activities. That is not this case.

What is at issue here is the narrow, very different conduct by Defendants ABIM and ABOG which was unheard of by them until only recently: ideologically motivated public action by these Defendants against physicians in a way that

sharply interferes with their ability to practice medicine. This action by Defendants ABIM and ABOG is not based on proficiency as demonstrated by performance on an exam. This type of action by these Defendants is not based on a physician's knowledge or skills, but rather is based on ideology and outspokenness. These Defendants could address their disagreement with a physician's ideology or public statements in a variety of ways other than restricting his general ability to practice medicine, which is quintessentially a public function.

Yet after acknowledging that Plaintiffs argued below for a finding of a public function (ROA.1230), the district court never addressed it in the context of Defendants ABIM's and ABOG's retaliatory actions that sharply restrict a physician's ability to practice medicine. Instead, the district court relied entirely on three outdated decisions that are inapplicable and nearly irrelevant here. *See Bailey*, 550 F.2d at 1019 (holding that private-entity licensure, as a "prerequisite for a valid Florida license," does not convert a private entity into a state actor, and that ABIM and ABOG have "no power to issue the licenses which permit one to practice medicine in the State"); *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250 (7th Cir. 1994), *as amended on denial of reh'g* (Jan. 11, 1995) (holding board certification as a prerequisite for certain public positions "does not convert the Board into a state actor" and "public beliefs that [a board's certification processes] *are* reliable ... do not bestow governmental power on the

Board") (emphasis in original); *Am. Bd. of Internal Med. v. Muller*, No. 10-CV-2680, 2011 U.S. Dist. LEXIS 25169, *6-*12 (E.D. Pa. Mar. 10, 2011) (acknowledging the importance of board certification but ultimately dismissing a constitutional claim, based on ABIM not being a state actor).

At the outset, it is noteworthy that ABIM and ABOG engage in their retaliation in an unnecessarily public manner in sharp contrast with, for example, the discipline of a student by a private university. ABIM and ABOG could have distributed their new policies about decertification in purely private communications with physicians, and maintained confidentiality over discipline as universities and employers commonly do. If this were truly a private process as these Defendants pretend in court, then Defendants would not have deliberately generated the publicity they did. It is in their attempt to perform a public function that Defendants ABIM and ABOG threaten to retaliate, and ABIM has already retaliated, in a very public way akin to a state medical board.

The three precedents on which the district court relied are not controlling. *Bailey v. McCann* – decided nearly a half-century ago – makes no mention of the public function test at issue here. The *Bailey* decision found a lack of state action because "it is a unilateral decision of that agency of government to use the USTA license as a prerequisite for a valid Florida license [and a]ny defect in the USTA system may translate into a defect in the State system for § 1983 purposes, but it

does not convert USTA conduct into state action." *Bailey*, 550 F.2d at 1019. But *Bailey* predated full development of the public function test. At most *Bailey* is incomplete today, and as a case about a harness horse racing driver it has little value in the context of the public function of regulating physicians. Moreover, it is doubtful that even a private entity that certifies harness racing drivers could discriminate with impunity based on religion, race, or public statements if the certification is required for state licensure.

Judge Wisdom of the Fifth Circuit subsequently considered the exclusion by a private organization of a horse trainer from the private property of a horse-racing track, and Judge Wisdom wrote for this Court in finding the existence of state action despite the ostensibly private nature of the action. *Sims v. Jefferson Downs Racing Ass'n*, 778 F.2d 1068 (5th Cir. 1985). The horse trainer was subjected to an eviction from the private facility the day after he criticized the conditions in the local newspaper, such that it was a retaliation against his exercise of free speech similar to here. There, as here, the status of the horse-trainer's state license was not the issue. It was prevention of plaintiff's use of his license at the private track that mattered. This is closely analogous to the facts of this case at bar, whereby Defendants ABIM and ABOG are excluding physicians from the full practice of medicine. The involvement of the state in *Jefferson Downs* is analogous to the

encouragement by the Federation of State Medical Boards (FSMB) of the retaliation by ABIM and ABOG against physicians.

Admittedly, in 1985 this Court in *Jefferson Downs* linked the existence of state action to an indirect nexus between state law and the private, proprietary decision to exclude the licensed plaintiff from the premises. But the real thrust of that decision was to ensure that there be a cause of action for such retaliation against plaintiff's exercise of his First Amendment right of free speech: "The district court must determine whether [plaintiff's] rights were denied as a direct result of his speech." *Jefferson Downs Racing Ass'n*, 778 F.2d at 1080. At issue here is licensed physicians' access to patients, and vice versa, with which Defendants ABIM and ABOG are interfering by retaliating against the exercise of free speech. The injustice here is very similar to the one found by this Court to constitute state action in *Jefferson Downs*.

As to the public function test, the Board Defendants behave as *de facto* state regulators, and are perceived and portrayed in that manner by the medical literature. *See* Michael DePeau-Wilson, "Regulators [including ABIM] Move Against Two 'Misinformation' Doctors," *MedPage* (November 1, 2022).[12] The Board Defendants' monopolies are akin to the "monopoly" over a shopping mall, which the U.S. Supreme Court held could be prohibited from censoring speech on

---

[12] https://www.medpagetoday.com/special-reports/exclusives/101529 (viewed Nov. 28, 2025).

private land. *See Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980). Like a shopping mall, the Board Defendants can easily disavow any opinion expressed by a physician to the public. *See also Belk v. Chancellor of Wash. Univ.*, 336 F. Supp. 45, 48 (E.D. Mo. 1970) ("[T]he acts of a private university can constitute 'state action' when said university is denying to its students their right to participate in the educational process. Education is a public function.").

The reliance by the district court on *Sanjuan v. Am. Bd. of Psychiatry & Neurology* is inapplicable, because that was a straightforward challenge to initial board certification rather than an objection to retaliation based on an exercise of freedom of speech. "Each [plaintiff] took an oral examination administered by a panel of specialists under the Board's regulations; each failed." *Sanjuan*, 40 F.3d at 248. The Seventh Circuit held that initial board certification is not state action. Plaintiffs here have no quarrel with that Seventh Circuit decision from 30 years ago. The issue here is the disciplinary-like conduct by Defendants ABIM and ABOG that is very similar in effect to state medical board discipline. Yet the district court never addressed this essential issue in this case.

Moreover, psychiatrists typically do not need medical staff privileges in hospitals in order to practice medicine; psychiatrists often practice from offices without needing any board certification. The "public function" test for state action was never an issue in *Sanjuan*. But as well-pleaded here and, as Defendants ABIM

and ABOG cannot credibly deny, physicians in Defendants' specialties do typically need medical staff privileges at hospitals in order to practice fully. Obstetricians, for example, need to be on hospital medical staffs in order to deliver babies. They are entirely dependent on ABOG for board certification as required by hospitals to have medical staff privileges.

Finally, the district court relied on *Am. Bd. of Internal Med. v. Muller*, which was a lawsuit brought by ABIM for copyright infringement and the defendant asserted a constitutional counterclaim alleging that ABIM is a state actor, in order to demand due process. But, as in *Sanjuan*, the case was based entirely on the board certifying organization staying in its traditional lane of basing its certification on competency, rather than revoking certification decades later based on outspokenness on issues of public policy. Indeed, ABIM's allegations against Dr. Von Muller were that she violated conditions required by the initial examination itself. The district court based its decision on how ABIM's "***role only involves the preparation, administration, and grading of a test*** which, *inter alia*, is used by peers to determine recognition of high professional achievement (board certification)." *Muller*, 2011 U.S. Dist. LEXIS 25169, at *11 (emphasis added). Here, Defendants ABIM and ABOG have strayed far outside their proverbial lane of test administration. The new roles assumed by Defendants ABIM and ABOG require scrutiny for their similarity to a public function.

**B. The Incorporation of Board Certification into Licensure by the Interstate Medical Licensure Compact Shows It Is a Public Function When Defendants ABIM and ABOG Decertify.**

The district court recognized that the Interstate Medical Licensure Compact – which is an agreement among 40 states (plus two territories) for granting the equivalent of multi-state medical licenses – requires board certification by Defendants ABIM and ABOG in their specialties: "[s]uch significance [of board certification] is demonstrated through the Interstate Medical Licensure Compact (IMLC), under which forty states have agreed to expedite the medical-licensure process for physicians who obtain board-certification." (ROA.1230, citing the IMLC website). But decertification by Defendants ABIM and ABOG operates as an automatic disqualification of a physician from this type of medical licensure in 40 states.

This incorporation by the IMLC reinforces how decertification by these Defendants is tantamount to a public function ordinarily performed by state medical boards, subject to constitutional requirements. Testing of physicians for competency as Defendants ABIM and ABOG have traditionally done is not the issue here, but the discipline or retaliation against a certified physician is functionally equivalent to a state medical board disciplining him, which likewise

disqualifies him from the IMLC.[13] Discipline by Defendants ABIM and ABOG is functionally equivalent to discipline by a state medical board for the purposes of eligibility for the IMLC. The latter is plainly a public function, and so is the former. The revocation of board certification for ideological rather than professional proficiency reasons constitutes state action.

In addition, the separate encouragement by the state-funded and state-controlled Federation of State Medical Boards ("FSMB") reinforces the state action here. On July 29, 2021, the FSMB issued an announcement demanding punishment of outspoken physicians, and less than six weeks later ABIM expressly relied on this encouragement by the FSMB: "The Federation of State Medical Boards (FSMB), which supports its member state medical licensing boards, has recently issued a statement saying that providing misinformation about the COVID-19 vaccine …." Joint Statement on Dissemination of Misinformation (Sept. 9, 2021). Less than three weeks later, Defendant ABOG did likewise, also citing the state-funded and state-controlled FSMB as its encouragement. *See* ABOG, *Statement Regarding Dissemination of COVID-19 Misinformation* (Sept. 27, 2021). The state-funded FSMB also maintains an entire website that invites the

---

[13] "Information For Physicians," Interstate Medical Licensure Compact, https://imlcc.com/information-for-physicians/ (viewed Nov. 25, 2025).

public to search on the name of any physician in the country, and be told by the

FSMB whether the physician is board certified or not by the Board Defendants.[14]

### III. Antitrust Injury Exists Because Physicians Are Being Excluded from the Market by Defendants ABIM and ABOG.

Defendants ABIM and ABOG are excluding physicians from practicing at

hospitals and in insurance networks, which reduces output. Plaintiffs Kory and

Marik have already had their board certifications revoked by Defendant ABIM,

with the result that they can no longer practice in hospitals and in insurance

networks. Defendants ABIM and ABOG exclude physicians who express

particular opinions, such as pro-life obstetricians in the case of ABOG's policy.

Consumers thereby have reduced access to these physicians, and thus reduced

choice in the market. Under the same authorities relied upon by the district court,

antitrust standing exists for individual physicians harmed by ABIM's and ABOG's

actions, including Plaintiffs Kory and Marik. *See, e.g.*, *Chi. Pro. Sports Ltd. P'ship

v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (a plaintiff must

"show that its loss comes from acts that reduce output or raise prices to

consumers," which Plaintiffs Kory and Marik have alleged and can easily show).

Consumers have lost access to these exemplary physicians, which decreases

consumer choice.

---

[14] *See* Docinfo by the FSMB, https://www.docinfo.org/ (viewed Nov. 28, 2025).

Defendant ABOG's threat to revoke certification of outspoken pro-life physicians is likewise actionable due to the decrease in consumer choice that results. *See Doctor's Hosp. v. Se. Med. All.*, 123 F.3d 301, 306-07 (5th Cir. 1997) ("The district court erred in holding that injury to competition in the market was a prerequisite of [plaintiff] DHJ's antitrust injury and in denying standing rather than addressing the claims' merits for summary judgment purposes."). The district court below made the very same error that its cited authority of *Doctor's Hosp.* warned against: premature dismissal of a case on antitrust standing grounds, rather than allowing the case to reach the summary judgment stage.

Although antitrust injury is not an Article III standing issue, the same one plaintiff rule should apply such that standing by one plaintiff means standing by all. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); *see also, e.g.*, *Horne v. Flores*, 557 U.S. 433, 445 (2009) ("Here, as in all standing inquiries, the critical question is whether at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'") (first emphasis added) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439-40 (2017) ("At least one

43

plaintiff must have standing to seek each form of relief requested in the

complaint.").

**A. The District Court Misapplied Inapplicable Precedents.**

The lower court misplaced reliance on another district court decision that

granted summary judgment – not a motion to dismiss – against plaintiff Dr.

Ginzburg as to antitrust injury concerning a recommendation to deny her

reappointment to a hospital medical staff, because this did not "decrease consumer

choice or quality of care." *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp.

998, 1015 (S.D. Tex. 1997). The district court explained that:

> Not only does she continue to treat patients at Memorial, she also holds staff
> privileges at ten Harris County hospitals. Consequently, Ginzburg has
> always had the option of transferring her patients to any of these hospitals as
> well as seeking referrals from physicians practicing at such locations or at
> any other hospital equipped to care for neonates.

*Id.* at 1016. This is in stark contrast with how the conduct at issue here is the

exclusion of physicians who speak out on certain issues, including pro-life matters,

from practicing in hospitals and in insurance networks. The reasoning in *Ginzburg*

for why antitrust injury did not exist there, on summary judgment, stands against

prematurely dismissing the complaint here on the grounds of antitrust injury.

The lower court also misplaced reliance on *Jefferson Cnty. Sch. Dist. No. R-

1 v. Moody's Inv's Servs. Inc.*, for its statement that "[i]n our view, the First

Amendment does not allow antitrust claims to be predicated solely on protected

speech." 175 F.3d 848, 860 (10th Cir. 1999) (quoted by ROA.1237) Plaintiffs are

not objecting "solely" to "protected speech" by Defendants, but to actions by

Defendants ABIM and ABOG that cause the exclusion of the Individual Plaintiffs

and others from practicing medicine in hospitals and in insurance networks. The

Defendants are not merely expressing an opinion that is constitutionally protected

speech as it was in the *Jefferson Cnty. Sch. Dist.* case; these Defendants are

engaging in conduct – the revocation of board certification that is professionally

necessary for physicians to fully practice medicine – and this is a misuse of their

monopoly power without protection as a mere opinion under the First Amendment.

A slew of Supreme Court decisions distinguished in the *Jefferson Cnty. Sch.
Dist.* decision are much closer on point here, and in those precedents an antitrust

violation was found by a professional association analogous to Defendants ABIM

and ABOG. *See Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*,

493 U.S. 411, 430-32 (1990) (affirming a finding that an attorneys' association's

boycott of case assignments involving indigent defendants violated antitrust laws

even though the boycott had an expressive component); *National Society of
Professional Engineers v. United States*, 435 U.S. 679 (1978) (affirming a finding

that a professional association's ban on competitive bidding for engineering

services violated antitrust laws even though one means of carrying out the ban was

through the publication of an ethical code); *American Society of Mechanical*

*Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982) (affirming a finding that a professional association violated the antitrust laws through the issuance of an inaccurate safety report used to undermine a competitor's product).

The *National Society of Professional Engineers* decision is closely analogous to the facts at bar here, and requires reversal of the decision below. There the antitrust violation was that a professional engineering association published a canon of ethics prohibiting competitive bidding by its members. Here, the Board Defendants have revoked or threatened to revoke needed board certification based on physicians' statements on matters of public concern. There is no meaningful distinction between an ethical rule binding engineers (who were free to quit the association and continue to practice engineering) and the threatened revocation of board certification of physicians who are thereby excluded from hospitals and insurance networks.

The heart of the Supreme Court holding in *Professional Engineers* was that ethical standards by a professional society can be in violation of antitrust laws if they have an "anticompetitive effect." *Prof'l Eng'rs*, 435 U.S. at 696 n.22 (Blackmun and Rehnquist, JJ.). The concurrence noticed and objected to this holding "that any ethical rule with an overall anticompetitive effect promulgated by a professional society is forbidden under the Sherman Act." *Id.* at 699. But only two Justices signed onto that concurrence, and even those Justices agreed that an

ethical rule having an anticompetitive impact *might* violate the Sherman Act. The two Justices felt that courts should retain "some flexibility in considering how to apply traditional Sherman Act concepts to professions long consigned to self-regulation." *Prof'l Eng'rs*, 435 U.S. at 699 (Blackmun and Rehnquist, JJ., concurring).

This Court need not follow this (rejected) minority view on the Supreme Court, but even if it prefers that approach, a reversal of the decision below is still required. The revocation of board certification based on ideology clearly and undisputably has an anticompetitive effect: physicians are being eliminated from medical staffs in hospitals based on their outspokenness on issues like abortion. Patients are being denied access to these physicians. There is no plausible justification under the Rule of Reason for the Board Defendants in causing this anticompetitive effect. But even if there were a conceivable justification for it, dismissal is inappropriate at the pleading stage.

Eminent physicians are being excluded from the market by the Board Defendants' retaliatory revocations, and this does reduce the quantity and quality of medical services. The conference host Plaintiff AAPS, and Plaintiffs Kory and Marik, all have antitrust standing. *See, e.g.*, *CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 535 (D.N.J. 2005) (it is premature to evaluate antitrust injury at the pleading stage).

### B. The Board Defendants' Misuse of Monopoly Power to Censor Speech Reinforces the Existence of Antitrust Injury.

The district court never reached the anticompetitive effect of the Board Defendants' conduct, and instead focused on and rejected an allegation in the Amended Complaint that "[m]isuse of monopoly power to censor speech about matters of public policy is a cognizable type of antitrust injury." (ROA.1236, quoting ROA.731 ¶ 221) The district court "acknowledges but does not adopt the novel view that censoring or suppressing speech is an antitrust injury." (ROA.1236) But it was premature and without precedent for the district court to exclude entirely, from antitrust injury, censorship by a monopolist of speech. Under this view any monopolist could withhold a product or services from a customer based on his political views. Nothing in the Sherman and Clayton Acts supports such a tyrannical result contrary to the public interest, and the district court cites nothing in the text of those Acts that would preclude applying them to the misuse of monopoly power at issue here. *See Sambrano v. United Airlines, Inc.*, 45 F.4th 877, 883 (5th Cir. 2022) (Ho, J., concurring in the denial of rehearing en banc) (decrying the misuse of market power by corporations to interfere with the ability of citizens to speak out, thereby undermining our democratic process).

The Supreme Court has repeatedly emphasized that:

[The Sherman Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. *Cf. United States v.*

*Socony-Vacuum Oil Co.*, 310 U.S. 150; *American Tobacco Co. v. United States*, 328 U.S. 781. The Act is comprehensive in its terms and coverage, ***protecting all who are made victims of the forbidden practices by whomever they may be perpetrated***.

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (emphasis added). *See also Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) (same). This Court held likewise in an unpublished opinion relied on by the district court in its first dismissal of this lawsuit (ROA.422). *See Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 737 (5th Cir. 2015) ("Typically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market. But ***standing is not necessarily limited to this group***.") (emphasis added).

When a monopolist refuses to sell its product to someone because of his exercise of his First Amendment rights, this is a restraint of trade that harms the public interest and constitutes market failure. The Sherman and Clayton Acts safeguard against this abuse of monopoly power. For example, if Big Tech monopolies refuse to deal with someone for supporting President Trump, then there is a valid antitrust claim against the monopolists regardless of whether he is a purchaser, competitor, or consumer of the platforms, or someone downstream from the market who is adversely affected by this market failure.

In fact, Plaintiffs Kory and Marik are consumers of Defendant ABIM in the sense of purchasing its board certification. So they satisfy the traditional test for

49

antitrust injury when ABIM retaliated against them by revoking its prior grant of board certification to them.

### C. Antitrust Injury Was an Inappropriate Basis for Dismissal at the Pleading Stage Below.

The district court prematurely dismissed Plaintiffs' claims based on a perceived lack of antitrust injury (ROA.1235-37), when precedent is against resolving the fact-intensive issue of antitrust injury on the pleadings. *See, e.g.*, *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) ("[T]he existence of an 'antitrust injury' is not typically resolved through motions to dismiss."). The Board Defendants abuse their monopoly power by acting "in an unreasonably exclusionary manner," by threatening to revoke board certifications of physicians based on disagreements with their public statements. *See, e.g.*, *Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1387 (5th Cir. 1980). It is the "exclusionary" effect that is the touchstone of this type of violation of antitrust laws, because that reduces economic output and that effect is virtually always harmful. A victim of such a refusal to deal has antitrust injury to challenge it. *See, e.g.*, *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951) (when the only newspaper in town refused to accept advertising from local merchants who also advertised on a new radio station, the Supreme Court held that was illegal under Sherman Act Section 2, and antitrust injury was not limited to the merchants themselves).

## IV.  Plaintiffs Adequately Pled Tortious Interference.

The public manner in which the Board Defendants announced their revocations of, and threats to revoke, board certification reflect their intent to interfere with one side of ongoing debates about public policy. By purpose and design, the Board Defendants' actions have a chilling effect on freedom of speech by physicians who hold board certifications by the Board Defendants. Despite this, the district court held that "[a]lthough the boards' actions and threats may have been flagrant or unwarranted, it is unclear how those actions were *unlawful*." (ROA.1233, emphasis in original) As to prospective business relations, the lower court dismissed Plaintiffs' claim by finding that a reasonable probability was not sufficiently alleged because Plaintiffs did not specifically describe in detail a proposed agreement that was not consummated. (ROA.1234)

But in fact Plaintiff Kory directly pled an effect regarding his business interests. "He is currently listed as an expert witness in a case before the Texas Medical Board that is affected by the ABIM revocation of his certification." (ROA.684 ¶ 13) Kory was removed as an expert witness as a result of the loss of his ABIM certification, and it should be inferred at the pleading stage that ABIM intended this effect. As to Plaintiff Marik, the Amended Complaint states that "[he] has delivered conference presentations, expert testimony and undertaken other professional activities in Texas that will be affected by the ABIM's revocation of

his board certification." (ROA.686 ¶ 15)

Plaintiffs Kory and Marik had co-founded an organization and were testifying frequently in legal and legislative forums. Defendant ABIM plainly understood and intended to disrupt their advocacy by revoking their board certifications. Likewise, the deterrence and disruption of candid presentations at Plaintiff AAPS's events by the unprecedented revocation of, and threats to revoke, board certification by Defendants ABIM and ABOG should be inferred as tortious from the pleadings, on a motion to dismiss.

## V.     Plaintiffs Kory and Marik Adequately Pled Defamation.

Because ABIM conducted a sham hearing that did not fairly adjudicate matters of legitimate professional disagreement, its revocation of Kory and Marik's certificates was an improper action intended to send a *per se* defamatory message. The district court was misled by ABIM to conclude that false statements by ABIM were not properly pled. In fact, specific defamation was also pled: "[o]n behalf of ABIM, and posting as its then-President and CEO, Dr. Baron wrongly defamed those who disagree with his approach to COVID as being 'friends of the virus.'" (ROA.694 ¶ 50) In addition, Plaintiffs' pleading included:

> While reasonable people can disagree with the aggregate meaning of available research, ABIM's conclusion that there is no evidence whatsoever in support of Drs. Kory's and Marik's views is arbitrary, capricious, and not credible; reflects ABIM's prejudgment on the issue; and illustrates that fair and due consideration of the matter was not provided.

(ROA.711-12 ¶ 124)

In articles cited in Plaintiffs' Amended Complaint, the reporting stated that ABIM's actions were taken because Kory and Marik are "disinformation doctors." ABIM had made public statements about its intentions to decertify physicians for alleged misinformation and ABIM's disparagement of these physicians was immediately published by the media. (ROA.733-34 ¶ 235) At the motion to dismiss stage, discovery has not yet been performed to determine the actual role of ABIM in these publications, and dismissal was inappropriate. The revocation of Kory's and Marik's certifications was intended to be an indictment of their professional opinions. The very purpose of ABIM's action was to send a public message of disparagement to physicians who speak out against its own policies. Defendant ABIM caused reputational harm to the Individual Plaintiffs, and should be answerable to the cause of action for defamation.

**VI. Plaintiffs' FACA Claim Against the Government Is Not Moot, and Was Improperly Dismissed Below.**

There is no mootness in Plaintiffs' FACA claim against the government. "FACA rights are enforceable *even after an advisory committee has been disbanded.*" *Cummock v. Gore*, 180 F.3d 282, 292 (D.C. Cir. 1999) (emphasis added, citing *Byrd v. United States EPA*, 174 F.3d 239, 243-44 (D.C. Cir. 1999)). As held by a district court in D.C.:

The federal government's statutory duty under FACA to allow the public to

inspect and copy documents may be limited in time by the statute, but the ability of a court to award access to the documents as relief for previous violations of that duty *is limited only by the existence of the documents*.

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 30

(D.D.C. 2002) (emphasis added), *aff'd sub nom.*, *In re Cheney*, 334 F.3d 1096

(D.C. Cir. 2003), *rev'd on other gnds.*, 542 U.S. 367 (2004).

Plaintiffs have standing under the informational part, based on Section

10(b), of their FACA claim. *See Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440,

450-51 (1989) (A FACA claim does not require proof of any injury-in-fact.). *See*

*also Byrd*, 174 F.3d at 243 ("According to the Supreme Court, a refusal to provide

information to which one is entitled under FACA constitutes a cognizable injury

sufficient to establish Article III standing.") (citing *Public Citizen*, 491 U.S. at

449); *Food Chem. News v. Department of Health & Human Servs.*, 980 F.2d 1468,

1469 (D.C. Cir. 1992) ("Whenever practicable, all [Federal Advisory Committee]

materials must be available for public inspection and copying *before* or *on* the date

of the advisory committee meeting to which they apply.") (emphasis added). In

*Byrd*, there was standing to pursue a FACA claim even though "the panel has

completed its work and been disbanded." *Byrd*, 174 F.3d at 244.

The evidence shows that then-Secretary Mayorkas immediately adopted, on

the same day it was issued, the *Subcommittee Final Report*, and Mayorkas even

expressly embraced these "recommendations as a guide [for the Department.]"[15]

Mayorkas thereby directly adopted the *Subcommittee Final Report*, which triggers

the application of FACA to the Subcommittee because it directly advised the

Secretary. As the D.C. Circuit explained about FACA:

> But "[i]f a subcommittee makes recommendations directly to a Federal
> officer or agency, or if its recommendations will be adopted by the parent
> advisory committee without further deliberations by the parent advisory
> committee, then the subcommittee's meetings must be conducted in
> accordance with all openness requirements" of FACA.

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 995 F.3d 993, 999 (2021)

(quoting 41 C.F.R. § 102-3.145). FACA applies because Mayorkas adopted the

Subcommittee recommendations "without further deliberations" by HSAC.

Members of DHS and the HSAC Subcommittee, which cited its numerous

interactions with DHS staff, constituted a working group "partially of federal

officials and agency members themselves and was not subordinate to any other

formalized decision-making body." *Pub. Emps. for Env't Responsibility v. Nat'l

Park Serv.*, Civil Action No. 19-3629 (RC), 2022 U.S. Dist. LEXIS 93204, at *52

(D.D.C. May 24, 2022).

By failing to disclose to the public all the records, reports, minutes, working

papers, drafts, and other documents that were prepared by or for the HSAC, then-

---

[15] *See* DHS Statement, "Following HSAC Recommendation, DHS terminates
Disinformation Governance Board" (Aug. 24, 2022). https://perma.cc/4WVL-
Y3D2 (viewed Nov. 28, 2025).

Secretary Mayorkas violated § 10(b) of FACA. (ROA.724-25 ¶¶ 173-80) *See* 5

U.S.C. app. 2 § 10(b) ("records, reports, transcripts, minutes, appendixes, working

papers, drafts, studies, agenda, or other documents which were made available to

or prepared for or by each advisory committee shall be available for public

inspection").

HSAC's Subcommittee lacked transparency in making its pivotal

recommendation related to the DGB, as adopted immediately by then-Secretary

Mayorkas. His conduct in violating requirements of FACA was arbitrary,

capricious, an abuse of discretion, and contrary to law, in violation of the APA, 5

U.S.C. § 706(2)(A), (B) and (D).

**VII. The District Court Improperly Denied Reasonable Discovery.**

Plaintiffs sought discovery from the government below, to obtain documents

created during the Biden Administration relevant to the claims here. Without

providing a valid reason, the district court blocked discovery. (ROA.1184)

This Court has emphasized that "Rule 26(c)'s requirement of a showing of

good cause to support the issuance of a protective order indicates that 'the burden

is upon the movant to show the necessity of its issuance, which contemplates a

particular and specific demonstration of fact as distinguished from stereotyped and

conclusory statements.'" *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998). *See*

*also EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 698 (5th Cir. 2017) (reversing a

protective order while quoting *In re Terra Int'l*, 134 F.3d at 306, which

quotes *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)); *Vasquez*

*v. U.S. Xpress, Inc.*, No. 2:24-CV-00289-JRG, 2024 U.S. Dist. LEXIS 225063, at

*5 (E.D. Tex. Dec. 11, 2024) ("Defendant offers a stereotyped conclusion that the

subpoena is overbroad. The Court finds that Defendant has failed to meet its

burden.") (citing *In re Terra Int'l*, quoted *supra*).

     The government never satisfied its burden to show good cause for blocking

discovery. The government failed to submit any affidavit or any other justification

for refusing to produce a single document in this case. As this Court held in its

foregoing quoted precedent which reversed a grant of a protective order, the

movant is expected to "support its motion for protective order with … affidavits or

other evidence that might provide support for" its motion, including "a particular

and specific demonstration of fact." *In re Terra Int'l*, 134 F.3d at 306 (inner

quotations omitted). Yet the government failed to satisfy this standard.

     Plaintiffs' requests were straightforward to obtain "[a]ll documents relating

to the Disinformation Governance Board or its disbanding as announced by DHS

on August 24, 2022, "[a]ll documents relating to the Homeland Security Advisory

Council Disinformation Best Practices and Safeguards Subcommittee," and "[a]ll

documents that mention any of the Plaintiffs [or the Board Defendants] in this

lawsuit." (ROA.1068) These requests were not burdensome, and the government

asserted no specific objections to them. The district court abused its discretion in blocking this discovery.

## CONCLUSION

Plaintiffs-Appellants respectfully request that this Court fully reverse the decision below.

Dated:  December 2, 2025                Respectfully submitted,

<u>/s/ Andrew L. Schlafly</u>
Andrew L. Schlafly
Attorney at Law
939 Old Chester Road
Far Hills, New Jersey 07931
Tel: 908-719-8608
Fax: 908-934-9207
Email: aschlafly@aol.com

*Attorney for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements pursuant to Fed. R. App. P. 32(a):

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 12,901 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: December 2, 2025

s/ Andrew L. Schlafly
Attorney for Appellants